CR # 03-1727-CBS

AFFIDAVIT

I, Richard M. Deasy, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Immigration and Customs Enforcement
   (ICE) , formally known as the Immigration and Naturalization Service (INS), and
   have been employed as a special agent for approximately eleven years.  I am
   currently assigned to the Federal Bureau of Investigation (FBI), Joint Terrorism Task
   Force (JTTF), in Boston, Massachusetts.  I have conducted numerous criminal fraud
   investigations relating to the manufacture and distribution of fraudulent identity
   documents.  I have served as the case agent and affiant  for several counterfeit
   document fraud, visa fraud,  and alien smuggling investigations.  I have conducted
   both domestic and international investigations relating to fraud and human trafficking.
   I have received terrorism training as it relates to fraud and material support
   investigations.  One of my responsibilities is investigating the counterfeiting of
   identification documents including visas and immigration documents in connection
   with alien smuggling.  From my training and experience, I know that certain
   criminals, usually aliens, manufacture and distribute counterfeit visas, resident alien
   cards, social security cards and other false documentation.  The counterfeit documents
   are then distributed and sold to aliens who have been smuggled into and reside
   illegally in the United States.

2. For the past six months I have been assisting the FBI by serving as a co-case agent in
   the investigation of a Brazilian alien smuggling organization ("ASO") involved in
   trafficking and harboring of undocumented aliens.  As detailed below, I believe that

-1-

there is probable cause to believe that the alleged ASO is involved in the

manufacturing of counterfeit United States identification documents which in turn are

sold to the undocumented smuggled aliens.

3.  This affidavit is submitted in support of:

    (a) a criminal complaint and arrest warrants charging

      EDER D COELHO, a Brazilian National, aka EDUARDO VIANA LUCAS,

      a/k/a, LEUAN  De CHANTEL; and

    (b) ABRAO A. OLIVEIRA, a Brazilian National, aka ABRAAO ALVES DE

      OLIEIRA, aka KEVIN BREY

      with knowingly, and without lawful authority, possessing, producing, and

      transferring false United  States identification documents, in violation of 18

      U.S.C. section 1028(a); and

      fraud and misuse of visas, permits, and other documents, in violation of

      18 U.S.C.  section 1546(a);

      encouraging or inducing an alien to come to, or reside in the United States,

      knowingly or in reckless disregard of the fact that such coming to, entry, or

      residence is or will be in violation of the law, in violation of 8 U.S.C section

      1324(a)(1)(A)(iv); and

      Conspiracy, in violation of 18 U.S.C. section 371.

    (c) a search warrant for the following residence: 252 Kennedy Drive, APT 713

      Malden, Massachusetts, Granada Highland Apartments.

      Granada Highland Apartments consists of 13 high rises apartment buildings .

Building 252 is on Kennedy Drive. Each building is numbered and contains numerous apartments. When facing the front of the building at 252 Kennedy Drive, the front doors are brown and wooden . As one enters through the main entrance glass door, the entryway leads to a lobby. A glass door then leads to an elevator. After proceeding upstairs to the seventh floor, apartments are located on both sides of the hallway. Apartment 713 is numbered as "713".

4. I base this affidavit on my own investigation and information I have received from co-case agent, Special Agent Nicholas Boshears (FBI), other FBI agents, agents of the United States Department of State's Diplomatic Security Services (DSS), troopers of the Massachusetts State Police, and a confidential source CS who has previously proven reliable, as described below.

5. The CS referred to herein has been a source of information for the FBI for the past nine months. The CS has previously furnished information to law enforcement which, in May 2003, resulted in the federal arrest and conviction of an undocumented alien in possession of a counterfeit United States visa (see United States v. Andre Luis Oliveira, Crim. No. 03-10162-RGS (D. Mass.)). The CS's information in that matter was utilized to obtain a federal arrest warrant and subsequently a stipulated removal/deportation of the defendant. In addition, in August 2002, the CS provided information on Jaouad Boutayeb, an illegal alien from Morocco. The CS identified the individual, and provided identifying and location information. Agents located and detained Boutayeb, who subsequently admitted to committing the felony of obtaining a fraudulent Social Security number, in violation of 42 U.S.C. § 408(a)(7)(A), while

-3-

in the United States. The CS has been participating in this investigation by in an undercover capacity. Throughout the investigation the CS has provided reliable and accurate information regarding several undocumented aliens in possession of counterfeit visas, human trafficking, and bank fraud.

### Background on the Alleged Criminal ASO and Scheme

6. In February 2003, I was assigned to the FBI, Joint Terrorism Task Force (JTTF). For the past eight months I have been assisting co-case agent Special Agent Nicholas Boshears in an investigation involving an alleged Brazilian ASO based in Massachusetts involved in human trafficking and the manufacture and delivery of counterfeit identification documents. As detailed below, there is probable cause to believe that the counterfeit identification documents are being sold to undocumented aliens in exchange for United States currency. As detailed below, the investigation showed that the alleged ASO helps facilitate the smuggled undocumented aliens obtain valid Massachusetts driver's licenses by presenting fraudulent visas and other counterfeit documents to state and federal officials. Thus, the alleged ASO is harboring the undocumented, smuggled aliens in Massachusetts by providing them with fraudulent United States visas, INS documents and Massachusetts driver's licenses. The alleged ASO uses a sophisticated network of runners and brokers to traffic the counterfeit documents and transport the illegal aliens to the different RMV's throughout the Commonwealth of Massachusetts.

### The Undercover Investigation

7. On July 25, 2003, EDER COELHO contacted the CS and offered him/her and

-4-

opportunity to join the alleged ASO by participating as a "runner and broker" of counterfeit documents manufactured by the alleged ASO. At a consensually-recorded meeting between COELHO and the CS, COELHO offered the CS an opportunity to transport illegal aliens for the alleged ASO to the Massachusetts Registry of Motor Vehicles ("RMV"), where the illegal aliens would use fraudulent documents to obtain legitimate Massachusetts driver's licenses. At the meeting, COELHO told the CS that he was producing high quality birth certificates, fraudulent visas and I-94s. COELHO further told the CS that he made a $2,000.00 profit on each alien for whom he arranged to get a license. In return for the CS's services, COELHO promised to pay the CS approximately $500.00 for each undocumented alien that the CS would facilitate and transport to the RMV. COELHO also outlined his involvement in alien smuggling. COELHO told the CS that he charges $10,000.00 per person to get an individual from Brazil into Mexico then into the United States by using an elaborate network of "safe houses" located in Laredo and the San Antonio, Texas area. COELHO explained to the CS that the aliens are then transported by van to Massachusetts. According to the CS, COELHO told him that he made approximately $400,000.00 - $500,000.00 in about six months. This meeting was surveilled and consensually-recorded by law enforcement.

8. On July 30, 2003, EDER COELHO, ABRAO OLIVEIRA and the CS met at 236 Elm Street, 2nd floor, in Everett, Massachusetts to further discuss the transportation of undocumented aliens to the RMV by the CS, and the manufacture and delivery of counterfeit documents that would be used in the operation. At this meeting,

-5-

COELHO showed the CS a locked room within the apartment that contained "document-making" implements which, according to the CS, included a computer, printer, scanner and shredder. COELHO told the CS that this was his office where they printed and produced the counterfeit documents. The CS also observed several passports and other identification documents near the computer equipment believed to be fictitious and/or fraudulent due to missing photographs and improper positioning of official seals. At this meeting, COELHO again discussed the price that he would pay the CS for his/her services. This meeting was surveilled and consensually-recorded by law enforcement.

9. A check with the United States Postal Police revealed that ABRAO OLIVEIRA and EDER COELHO both received mail at 236 So. Elm Street, 2nd floor, Malden, Massachusetts.

### The First Undercover Meeting

10. On August 1, 2003, EDER COELHO arranged to meet with the CS to facilitate getting an undocumented alien a driver's license. At the direction of COELHO, the CS transported a person whom the CS was told was an alien to the RMV in Lowell, Massachusetts. At the registry, the alleged alien applied for a driving permit and presented a purported United States visa to the registry officials. While at the registry, the CS also showed law enforcement the same visa that was presented to the registry officials. This visa was inspected by law enforcement, and as a result of that field examination, I believe that visa to be counterfeit. For her/his services, the CS was paid $300.00 in U.S. currency by COELHO.

-6-

**The Second Undercover Meeting**

11. On August 11, 2003, EDER COELHO spoke to the CS on the phone and arranged for the drop-off and transport of an alleged alien to the RMV in Haverhill, Massachusetts in order to get a Massachusetts driver's license. COELHO explained to the CS that the alien would be presenting a counterfeit United States visa, a counterfeit Brazilian birth certificate, and other identity documents to the registry officials. COEHLO directed the CS to help translate the fraudulent documents and official registry documents into Portuguese for the alien. This call was monitored and consensually-recorded by law enforcement.

12. Also on August 11, 2003, the CS provided law enforcement with the documents supplied by COELHO which were utilized by the alien at the RMV. All the fraudulent documents listed below were photographed and consensually-recorded by law enforcement:

> Brazilian Passport in the name of JOSEIO FILIPE MARTINS, DOB 12/12/1975 bearing Passport Number (CJ 8855906);
>
> United States Immigration I-94 Entry/Exit Document bearing Admission Number (12563541225); and
>
> United States Visa bearing Foil Number (49564525).

13. A search of the DHS-Central Index System, Non-Immigrant Information System indicates that the Immigration I-94 Admission Number 12563541225, the second document listed above, was never issued by the INS and is considered not valid. A search of the Brazilian passport number CJ 8855906, the first document listed above,

reveals that no person has ever made a lawful entry into the United States bearing the name JOSIEO FELIPE MARTINS using a Brazilian passport using that number.

14. Also on August 11, 2003, the CS met with COELHO at 236 South Elm Street, 2nd floor in Everett, MA. At the meeting, the CS gave COELHO $2,000.00 which the undocumented alien had given the CS for the fraudulent visa, birth certificate and license which COELHO provided and/or arranged. The payment consisted of a blank signed check for $1,300.00 and $ 700.00 in U.S. currency. In exchange for the transportation services, COELHO paid the CS $300.00 in United States currency. The meetings on August 11, 2003 were all surveilled and consensually-recorded by law enforcement.

15. A subsequent investigation by Special Agent Boshears with Fleet Bank Fraud Investigator Barbara Minkwitz revealed that the $1,300.00 signed blank check given to COELHO on August 11, 2003 by the CS for the fraudulent documents was later made out to defendant ABRAO OLIVEIRA and deposited into a Fleet bank account in the name of ABRAO OLIVEIRA.

16. On August 19, 2003, COELHO spoke to the CS by phone and informed the CS that he and the alleged ASO would be moving his operation to a new residence and that he needed to look for a new office location to conduct his business. This conversation was consensually-recorded by law enforcement.

### The Third Undercover Meeting

17. On August 22, 2003, COELHO talked to the CS on the phone and arranged for the CS to meet with and transport another alleged undocumented alien to the RMV in

Haverhill, Massachusetts on behalf of COELHO and OLIVEIRA. The CS was

further instructed by COELHO to help the alien apply for a driving permit and

license. COELHO told the CS he would be supply him/her with a set of documents

for the alien to use at the RMV. This call was consensually-recorded by law

enforcement.

18. Also on August 22, 2003, an unknown male provided the CS with a set of fraudulent

documents that included a United States visa and an I-94 entry/exit document. (This

unknown male apparently did so on behalf of COELHO). The CS transported an

alleged undocumented alien by the name of CALUDIANO DA SILVA, DOB

02/26/1980 to the RMV located in Haverhill, Massachusetts. At the RMV, the

undocumented alien presented the visa, passport, and other documents to RMV

officials in order to get a driver's permit. While at the RMV, and under surveillance

by law enforcement, the CS met with FBI Special Agent Scott Dietsche and myself.

During this meeting, the CS provided me with the same fraudulent documents used by

the alien to apply for his driving permit. This meeting was surveilled and

consensually-recorded by law enforcement. Special Agent Dietsche and I recorded the

identification data of, and photographed the following fraudulent documents:

> Brazilian passport bearing the name CLAUDIANO DA SILVA BARRETO,
> DOB 02/26/1980, Passport Number: (CL 689044);
>
> United States Visa bearing Control Number (20000335552514) and Foil Number
> (48564021); and
>
> U.S. Immigration I-94 Entry/Exit Document bearing Admission Number
> (23215478208).

19. A search of the DHS-Central Index System, Non Immigrant Information System indicates that the Immigration Entry/Exit I-94 Admission Number 23215478208, the last document identified above, was never issued by the INS and is not a valid number. A search of the Brazilian passport number CL 689044, the first document listed above, revealed that no person has ever entered the United States lawfully bearing the name CLAUDIANO Da SILVA BARRETO, DOB 02/26/1980 using that Brazilian passport number. This affiant has learned from the Department of State that the Visa Control Number 20000335552514, the second document listed above, is not valid and has never been issued by the Department of State. This affiant has also been informed by the Department of State that the Visa Foil Number 48564021 was never issued to CLAUDIANO Da SILVA BARRETO.

20. Also on August 22, 2003, the CS gave COELHO $2,500.00 in US. currency on behalf of the alleged undocumented alien for the fraudulent documents and driver's permit which the alleged alien provided to the CS. In exchange for his transportation services, COELHO paid the CS $300.00 in U.S. currency. Also present at the meeting was ABRAO OLIVEIRA. According to the CS, COELHO gave OLIVEIRA $1,000.00 for his part in the deal. This meeting was surveilled and consensually-recorded by law enforcement.

21. On September 3, 2003, COELHO and the CS conducted a phone conversation regarding fraudulent documents. COELHO informed the CS that he had recently moved and was now residing at 252 Kennedy Drive, Apt. 713, Malden, Massachusetts, 02148. This call was monitored and consensually-recorded by law

-10-

enforcement.

22. Also on September 3, 2003, the CS met with COLEHO at his new residence located
at 252 Kennedy Drive, Apt. 713, Malden, Massachusetts. The purpose of the CS's
visit was to place an order for a fraudulent visa, I-94, Brazilian birth certificate
and other documents. The CS gave COELHO a Brazilian passport, bearing the name
of WILTON ZAQUIAS DA SILVA, DOB 12/06/1973. During this meeting the CS
spoke with EDER COELHO and ABRAO OLIVEIRA. Prior to the CS meeting
between COELHO and OLIVEIRA, Special Agent Dietsche verified that the
photocopied pages of DA SILVA's passport matched the actual pages of the passport.
Special Agent Boshears then placed his initials in blue ink in the top right-hand corner
of page 32 of the passport. This meeting was surveilled and consensually-recorded
by law enforcement.

**The Fourth Undercover Meeting**

23. On September 4, 2003, COELHO spoke to the CS on the phone regarding the
fraudulent documents and the passport that the CS dropped off at 255 Kennedy Drive,
Apt. 713, Malden, Massachusetts. COELHO further informed the CS that the
fraudulent documents would be ready for pick-up by the CS by the morning of
September 5, 2003. This call was monitored and consensually-recorded by law
enforcement.

24. On September 5, 2003, COELHO and ABRAO OLIVEIRA met with the CS and
delivered the fraudulent documents – a visa, an I-94, a Brazilian birth certificate, and
a cancelled check in the false name of WILTON ZAQUIAS DA SILVA to the CS.

-11-

According to the CS, OLIVEIRA handed him an envelope that contained the fraudulent documents. COELHO was observed by this affiant and Special Agent Dietsche driving a vehicle bearing Massachusetts license plate 37BH17. Checks of the Massachusetts Registry of Motor Vehicles revealed that this vehicle is registered to ABRAO OLIVEIRA. This meeting was surveilled and consensually-recorded by law enforcement.

25. After the meeting, the CS met with Special Agent Dietsche and I. The CS presented the same Brazilian passport, as marked by Special Agent Boshears, which was previously given to COELHO by the CS on 09/03/203. After receiving the passport from the CS, I conducted a field inspection of the passport. The passport received from OLIVEIRA by the CS contained a counterfeit United States Visa and counterfeit I-94 entry/exit document both in the name of WILTON ZAQUAIS DA SILVA, DOB 12/06/1973. The counterfeit visa contained Control Number 2005433524524 and Foil Number 48564524. The counterfeit Immigration I-94 contained Admission Number 48367195295.

26. A search by this affiant of the DHS-Central Index System, Non Immigrant Information System indicated that the Immigration Entry/Exit I-94 Admission Number 48367195295 was never issued by the INS. A search of the Brazilian passport number revealed that no person has ever entered the United States lawfully bearing the name WILTON ZAQUIAS Da SILVA, DOB 12/06/73 using Brazilian passport number CL 3288580.

27. On September 8, 2003, I received information from the property manager at 252

Kennedy Drive, Malden, Massachusetts, that ABRAO OLIVEIRA has a rental application dated September 5, 2003 for 252 Kennedy Drive, Apt. 713, Malden, Massachusetts. On September 9, 2003, during the early morning hours, Special Agent Boshears conducted a brief surveillance of the parking lot located adjacent to 252 Kennedy Drive, Malden, Massachusetts. Special Agent Boshears informed me that he observed a vehicle bearing bearing Massachusetts license plate 37BH17 located in the parking lot. Checks of the Massachusetts Registry of Motor Vehicles indicate that the vehicle is registered to ABRAO OLIVEIRA.

28. I have executed and/or assisted in the execution of several federal search warrants for various counterfeiting devices, documents, records, and proceeds derived from the trafficking in counterfeit documents and smuggling investigations. I have received training in means and methods used by the counterfeiters to possess, manufacture, and distribute counterfeit documents. I have received training in the means and methods used by the counterfeiters to conceal their assets and methods used by counterfeiters and smugglers to maintain records of their vending and trafficking assets. I have also received training in the means and methods used by persons involved in counterfeiting and trafficking of fraudulent documents.

29. I have been involved in numerous seizures of counterfeit documents and devices including birth certificates, visas, immigration documents, passports, social security cards, computers, cameras, and laminators. I have been involved in numerous searches of dwellings, buildings, and vehicles which counterfeit traffickers have utilized.

30. Based upon my training and experience, I have learned that counterfeiters keep records, documents and ledgers showing dates, names, and amounts paid for counterfeit documents, and United States Currency which is proceeds of counterfeit documents and human trafficking activity .

31. Based upon my eleven years of experience as a Special Agent with the Bureau of Immigration and Customs Enforcement, formally known as the Immigration and Naturalization Service, I am familiar with the tools, equipment and materials necessary for the manufacture of counterfeit documents including; laminate, computers, ink pads, cutting tools, typewriters, copiers, sealing mechanisms, photography equipment, and blank documents.

32. Based on the foregoing information, I believe probable cause exists to believe that EDER COELHO and ABRAO OLIVEIRA have committed violations of 18 U.S.C. §§1028(a), 1546(a) and 371, and 8 U.S.C 1324(a)(1)(A)(iv).

33. I also believe there exists probable cause to believe that property that constitutes evidence of the commission of criminal activity, contraband, the fruits of the crime, and property intended for use in committing a criminal offense but not limited to records and documents showing dates, names and amounts paid for counterfeit documents, United States currency, documents, tools, equipment, materials necessary for the manufacture of counterfeit documents including laminates, computers, typewriters, ink pads, cutting tools, plastic laminate, sealing mechanisms and blank documents, are maintained in and on the premises at 252 Kennedy Drive, APT 713, Malden, Massachusetts as described in this affidavit.

-14-

## NECESSITY OF OFFSITE SEARCH OF COMPUTERS

34. During the course of this and other investigations, I have consulted with computer
forensic specialists within ICE. From my training and experience, I am aware that the
proper retrieval and analysis of all electronically stored (computer) data, the
documentation and authentication of such data, and the prevention of the loss of the
data either from accidental or deliberate programmed destruction, requires on-site and
laboratory analysis by a qualified computer specialist. To effect such accuracy and
completeness requires the seizure of all computer equipment and peripherals, which
may be interdependent, the software to operate the computer system, and related
instruction manuals which contain directions concerning the operation of the
computer system, and the software programs.

35. I am aware that computer storage devices, such as hard disks, diskettes, tapes, and
compact disks, can store the equivalent of thousands of pages of information. As an
example, a one hundred megabyte (100MB) hard drive would have the capacity for
storing approximately 50,000 pages of typewritten, double-spaced text, however, I
have also been advised that the majority of computers currently sold have as a
minimum, twenty gigabyte (20000MB) hard drives, or larger, with an equivalent
capacity in excess of 10 billion pages of typewritten, double-spaced text.

36. Based upon information I have received from computer specialists, when a user
wants to conceal criminal evidence, he/she often stores it in random order with
deceptive file names. This requires the agents conducting the search to examine all
the stored data to determine which particular files are relevant and fall within the

-15-

scope of the warrant. This search process can take weeks or months, depending on
the volume of data stored, and it would be impractical to attempt this kind of data
search on-site.

37. With respect to this latter part of the search, the analysis of electronically stored data,
whether performed on-site or in a laboratory or other controlled environment, may
entail any or all of several different techniques. Such techniques may include, but
shall not be limited to, surveying various file "directories" and the individual files
they contain (analogous to looking at the outside of a file cabinet for the markings it
contains and opening a drawer capable of containing pertinent files, in order to locate
the evidence and instrumentalities authorized for seizure by the warrant); "opening"
or reading the first few "pages" of such files in order to determine their precise
contents; "scanning" storage areas to discover and possibly recover recently deleted
data; scanning storage areas for deliberately hidden files; or performing electronic
"key-word" searches through all electronic storage areas to determine whether
occurrences of language contained in such storage areas exist that are intimately
related to the subject matter of the investigation.

38. Upon information and belief, searching computer systems for criminal evidence is a
highly technical process requiring expert skill and a properly controlled environment,
and that data search protocols are exacting procedures designed to protect the integrity
of the evidence, and to recover even "hidden", erased, compressed, password
protected, or encrypted files. I understand that many commercial computer software
programs also save data in unique formats which are not conducive to standard data

-16-

searches. For instance, some programs create temporary "print files" for the generation of hard-copy printouts then automatically deletes them after a time set by the computer user; the remaining data is then compressed into a format that is not viewable with standard utility software programs.

39. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive codes imbedded in the system as a "booby trap"), a controlled environment is essential to a complete and accurate analysis. In order to fully retrieve data from a computer system, the analyst needs to seize all magnetic storage devices, as well as the centralized processing units (CPU's) in order to search them in a laboratory or controlled environment.

40. To the extent practical, if persons claiming an interest in any seized computer so request, I will make available to those individuals "bit by bit" or "cloned" copies of the computer(s) hard-drives within a reasonable time after the execution of the search warrant to minimize any impact that said seizures may have on their personal and/or business operations. If after inspecting the computer system, including all input-output devices, system software, and instruction manuals, a computer specialist

determines that these items are no longer necessary to retrieve and preserve the data

evidence, I will return them as soon as practicable.

Richard M. Deasy
Special Agent
Immigration and Customs Enforcement

Subscribed and sworn to before
me this 9th day of September 2003
at Boston, Massachusetts.

U.S. Magistrate Judge